UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
OCALA, FLORIDA

| | |
|---|---|
| UNITED STATES OF AMERICA ex rel. CONNIE CROSSLIN, <br><br> Plaintiffs, <br><br> v. <br><br> OCALA INTEGRATIVE MEDICINE, LLC; ETHOS HEALTH GROUP, LLC; DR. ANTHONY SANCETTA; and DR. JONATHAN WALKER; <br><br> Defendants. | CASE NO.: 5:22-cv-105-JA-PRL <br><br> (FILED UNDER SEAL) <br><br> DO NOT PLACE ON PACER |

## QUI TAM COMPLAINT

This is an action brought by Plaintiff/Relator Connie Crosslin ("Relator") on behalf of the United States pursuant to the Federal False Claims Act, 31 U.S.C. § 3729, *et seq*. ("FCA"). In support thereof, Relator alleges as follows:

1. From at least 2017 and continuing through the present, Ocala Integrative Medicine, LLC ("OIM"), Ethos Health Group, LLC ("Ethos"), Jonathan Walker ("Walker") and Anthony Sancetta ("Sancetta") (collectively "Defendants"), owners and providers of chiropractic services in Florida, engaged

1

and continue to engage in deliberate, concerted actions designed to defraud the United States by knowingly submitting and/or causing to be submitted false and/or fraudulent claims for payment to the Medicare program. Specifically, Defendants knowingly and purposefully: (1) misrepresent the qualifications of employees; (2) prescribe unnecessary durable medical equipment ("DME") to patients; (3) order unnecessary lab tests, injections and physical therapy for patients; (4) pay illegal financial incentives to employees; (5) engage in upcoding; and (6) falsify paperwork to maximize billing submissions to Medicare.

2. The FCA provides that any person who knowingly submits or causes to be submitted to the Government a false or fraudulent claim for payment or approval is liable for a civil penalty of between $10,781 and $21,562 for each such claim, and three times the amount of the damages sustained by the government. The FCA permits persons having information regarding a false or fraudulent claim against the Government to bring an action on behalf of the Government and to share in any recovery.

3. Pursuant to the FCA, Relator seeks to recover on behalf of the United States damages and civil penalties arising from Defendants' intentional submission of false and fraudulent claims to the Medicare program.

## JURISDICTION AND VENUE

4. This Court has subject matter jurisdiction over this action pursuant to 31 U.S.C. § 3732(a), 28 U.S.C. §§ 1331, 1345 and 1367.

5. This Court has personal jurisdiction over the Defendants pursuant to 31 U.S.C. § 3732(a), which authorizes nationwide service of process, because Defendants can be found in, reside in, transacted business in, and/or have committed the alleged acts in the Middle District of Florida.

6. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)-(c) and 31 U.S.C. § 3732(a) because Defendants can be found in, reside in, or have transacted business in the Middle District of Florida.

## PARTIES

7. The United States is the real party in interest to this lawsuit. The United States Department of Health and Human Services ("HHS"), through the Centers for Medicare & Medicaid Services ("CMS") administers the Medicare program, which provides federally funded health insurance for persons 65 and older, persons under 65 with certain disabilities, and persons of all ages with end-stage renal disease.

8. Relator Connie Crosslin is a citizen of the United States. She currently resides in Ocala, Florida. Relator was employed by Defendant OIM as n Advanced Registered Nurse Practitioner ("ARNP") (NPI No.: 1144213109) from May 2017 through March 2019. She was terminated on March 31, 2019.

9. Defendant Ocala Integrative Medicine, LLC (NPI: 1548410756) is a chiropractic practice located at 1541 SE 17th Street in Ocala, Florida. OIM was founded in 2008, and is managed by Defendant Walker. Defendant OIM also operates under the fictitious name "Florida Spine & Injury, LLC" ("Florida Spine"). Florida Spine has 27 locations throughout Florida and two locations in Maryland. Florida Spine's Florida locations operate under both the "Florida Spine & Injury" name and the "Ethos" name. Maryland locations operate under the "Ethos Health Group" name.

10. Defendant Ethos Health Group, LLC has its principal address at 1541 17th SE Street in Ocala, Florida 34471. Ethos has 32 locations across Florida and Maryland. It offers services for knee pain and neuropathy. Defendant Walker is the manager and Chief Executive Officer of Ethos.

11. Defendant Jonathan Walker (NPI: 1801092218) is a chiropractor who practices in Ocala, Florida. Defendant Walker is the registered agent for more than 15 Florida corporations, 8 of which are chiropractic clinics.

12. Defendant Anthony Sancetta (NPI: 1043218233) works for Defendant OIM practicing neuromusculoskeletal medicine. Defendant Sancetta was the original medical doctor at OIM.

## LEGAL BACKGROUND

## The False Claims Act

13. The False Claims Act, 31 U.S.C. § 3729(a)(1) provides, in relevant part, that any person who:

    (A)    knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

    (B)    knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; and/or

    (C)    conspires to commit a violation of subparagraph (A) or (B);

is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $11,000 . . . plus 3 times the amount of damages which the Government sustains because of the act of that person.[1]

14. The FCA permits individuals to bring civil actions in the name of the government. 31 U.S.C. § 3730(b)(1).

15. Relator seeks to recover damages and civil penalties in the name of the United States arising from the false statements and fraudulent claims for payment made by Defendants to the Medicare program.

## The Medicare Program

16. The Medicare program is a health insurance program administered by the United States, which is funded through taxpayer revenue. Medicare is directed

---

[1] The civil penalties assessed under the FCA were adjusted by the Federal Civil Penalties Inflation Adjustment Act, 31 U.S.C. § 3729(a)(1). The current civil penalties for violations of the FCA range from not less than $10,781.40 to not more than $21,562.80.

by HHS, and was designed to assist participating states in providing medical services and durable medical equipment to persons over 65 and certain other persons who qualify for coverage.

## Durable Medical Equipment

17. Medicare Part B covers "medically necessary" DME prescribed by a doctor or treating practitioner. "Medical necessity" is defined as healthcare services or supplies needed to diagnose or treat an illness, injury, condition, disease, or it symptoms, and that meet the accepted standards of medicine. 42 U.S.C. § 1395(A)(1)(a).

## ALLEGATIONS

### Defendants Over-Prescribe DME, the DME is Often Prescribed by Non-Licensed Personnel and Defendants Instruct Employees to Alter Patients' Paperwork to Maximize Medicare Billing

18. Defendants Walker and Sancetta, through Defendants OIM and Ethos, put in place a multi-faceted scheme designed to defraud the Medicare program. The practices are ongoing.

19. Defendants' scheme began at OIM in or around 2017 with the improper solicitation of Medicare beneficiaries, which continues to this day. The solicitation occurs through newspaper advertisements which offer free physician consultations. However, the "free consultations" are not performed by doctors, but

by OIM employees referred to as "Patient Experience Managers" ("PEMs"). The consultations are not free; they are billed to the Medicare program.

20. OIM pays its PEMs incentive bonuses based upon: (1) the number of procedures they prescribe, (2) the number of DME devices distributed to patients, and (3) the number of patients they refer to physical therapy. Defendants incentivize the PEMs to overprescribe DME.

21. OIM's employees treat patients referred for physical therapy at OIM facilities. Oftentimes, the employees have no medical qualifications.

22. In order to maximize their bonuses, OIM's PEMs prescribe an inordinate number of fluoroscopies, injections, x-rays, DME, and physical therapy. More than 90 percent of all new OIM patients are provided with DME equipment, receive x-rays and therapeutic injections, and/or are referred for physical therapy, though none of these treatments or services are actually needed.

23. Nearly all of OIM's patient x-rays purport to show the same diagnosis—varus/valgus deformity—which OIM uses to justify the prescription of braces and injections. Additionally, Defendant Sancetta runs an identical report for almost all OIM patients—each patient suffers from the same ailments, and needs two knee braces and one back brace. Defendant Sancetta upcodes patient visits by adding unnecessary physical exam elements that are not needed for effective patient care.

24. Medicare reimburses knee and back braces at $700 and $1,100 respectively.

25. DME prescribed to patients is distributed through OIM's purported DME company, which is presented to patients as the "Ocala Integrative Medicine DME Company." That company does not appear to exist in Florida business records.

26. Most patients treated by Relator and OIM's other nurse practitioners are actually being billed as though they were treated by Defendant Sancetta at a higher-than-permissible reimbursement rate. For example, Relator frequently documented new patient charges for patients she examined under codes 99203 and 99204. However, when Defendants submitted those claims to Medicare, the claims were submitted using Defendant Sancetta's NPI, not Relator's NPI. Medicare pays 20 percent more for office visits billed under a doctor's NPI than it does for office visits billed under an ARNP's NPI.

27. This practice was widespread and constant. Defendant Sancetta justified it under the Medicare's "incident to" provision, which allows a patient to be seen by a physician's assistant ("PA") or APRN and be billed under the physician's name IF certain criteria are met. One of those criteria is the doctor must be on-site when the PA or APRN renders the service. Services performed by Relator and all other nurse practitioners (all of whom were trained by Relator)

were often billed under Defendant Sancetta's name, though Relator and the nurse practitioners mainly worked out of offices separate from Defendant Sancetta.

28.   Defendant Sancetta often billed Medicare under his own NPI for services provided by Relator. Defendant Sancetta also billed Medicare for services rendered at locations he never visited. For example, Relator was in the Gainesville office two days per week, but Defendant Sancetta was never there; however, services Relator rendered were billed to Medicare using Defendant Sancetta's NPI. This practice also occurred at the Lake City location; Dr. Sancetta billed under his name for Relator's services, though he was never in the Lake City office.

29.   During the period from June 1, 2018 through December 31, 2018, Relator and Defendant Sancetta each worked two days per week at both the Ocala and The Villages offices. OIM billed Medicare using code 99203 for each new visit. During that time period at the Ocala office, Relator's NPI was used to bill for 18 new patient visits. Defendant Sancetta's NPI was used to bill for 132 new patient visits. During that same time period at The Villages office, Relator's NPI was used to bill Medicare for 7 new patient visits; Dr. Sancetta's NPI was used to bill for 235 new patient visits. Relator knows firsthand that the majority of the claims submitted to Medicare using Defendant Sancetta's NPI at the Ocala and The Villages locations were fraudulent because she was present in those locations at the

same time as Defendant Sancetta. The billing submissions should be roughly the same for Relator and Defendant Sancetta.

30. Defendants Walker and Sancettta are both aware this is occurring, and they encourage these fraudulent practices. Walker and Sancetta spread this practice to all of the companies they have acquired. The fraud is continuing to this day. Relator is aware of the ongoing fraud because she continues to keep in touch with friends who are currently employed with Defendants.

31. OIM, through Defendant Walker, also instructs its employees to add and/or change patients' documentation in order to maximize reimbursement from Medicare. Relator witnessed this firsthand; Defendants instructed Relator to make changes to her own paperwork. For example, on January 31, 2019, Defendants told Relator she needed to alter an initial office visit note for patient H.M., which was originally made in November 2018. Defendants instructed Relator to do this so OMI could justify the submission of claims to Medicare-provided services. Additionally, she saw alterations to her own documentation that she had not made herself. For example, on April 6, 2018, she noticed changes to an office visit note she had recorded for a traumatic brain injury patient, W.F., which included services she did not provide, such as "cognitive performance testing in order to assess the extent of the effects of the traumatic brain injury . . . ."

32. In addition to altering paperwork to reflect services that were not performed, Defendants also billed Medicare for DME prior to actually seeing patients. For example, employee Michael Torres saw Patient J.L. on November 6, 2018. However, Defendant OIM submitted an order for a knee brace for J.L. on October 30, 2018—a week prior to her actual visit. The knee brace was dispensed before J.L.'s appointment.

**Defendants' Relationship with Osteoarthritis Centers of America**

33. Osteoarthritis Centers of America ("OCA") is a company headquartered in Houston, Texas. It registered with the Florida Department of Corporations ("FDOC") in November 2007. It de-registered with FDOC in July 2016. One of Defendant Walker's companies, Ocala Spine and Injury Specialists, LLC ("OSIS") was an affiliate of OCA. FDOC lists OSIS' principal address as 1541 SE 17th Street in Ocala, Florida, which is also Defendant OIM's principal address.

34. Although OCA was not registered to do business in Florida after July 2016, it continued to advertise as though it was still an active Florida corporation. Beginning on or about November 2017, newspaper advertisements began appearing in the Gainesville Sun and the Ocala Star Banner that offered free arthritis screenings at OCA for Medicare beneficiaries. The telephone number listed in the advertisements was the same as OIM's telephone number, and patients

who responded to the ad were funneled to OIM for their "free screenings." The majority of the screenings were conducted by non-physician employees at OIM, and the patients were routinely referred for unnecessary treatment by OIM's physicians and physical therapists, as well as for DME that was not needed.

### Introduction of Ethos Health Group

35. Ethos Health Group was incorporated by Defendant Walker in 2018. Ethos was a major part of OIM's expansion, as it gave access to locations all over Florida, as well as several locations in Maryland. Defendant Sancetta was also involved with Ethos' operations.

36. Ethos continued the same practices Defendants Walker and Sancetta had implemented at OIM. Ethos continued the improper recruitment of patients and the over-prescription of DME. Services rendered by ARNPs continued to bill under Defendant Sancetta's NPI, even when he was not on the premises.

37. Additionally, he physical therapy at the Ethos locations was substandard at best. For example, Relator became aware that physical therapy for peripheral neuropathy treatment at Ethos' Sun City and St. Petersburg locations included nothing more than a bare room and a tennis ball. Defendants dispatched Relator to work at the Daytona and Melbourne offices for one week in 2018, where she observed the same "therapy" practice. Rich Wilhelmsen was in charge hiring,

training and billing for the physical therapy practices at all Ethos locations; he was extremely involved with Defendants Walker and Sancetta. Defendants Walker and Sancetta knew they were submitting claims to Medicare for physical therapy that Medicare would not have reimbursed had it known the "therapy" was being performed with a single tennis ball.

38. Ethos also engages in the practice of convincing patients to agree to visco-supplementation injections. Ethos does this in order to be able to charge Medicare for fluoroscopy (CPT code 77002) in addition to the injections, even though visco-supplementation injections is largely unnecessary for the patients being treated at Ethos' facilities. Ethos vastly over-utilizes fluoroscopy for the types of patients it treats in order to get higher reimbursements from Medicare.

**Retaliation and Termination**

39. Relator was hired in 2017. She was the first nurse practitioner at OIM (specifically, at Ocala Spine & Injury and Central Florida Spine & Injury). She was hired shortly after interviewing with Jean Gonzalez, the office manager, and Jonathan Walker, one of the owners. She was hired to train other nurse practitioners so the practice could begin to expand throughout the state of Florida.

40. From the onset, Relator took notes about specific issues she noticed

regarding unlawful practices. She repeatedly brought these issues to the attention of Dr. Walker. The unlawful conduct was in regards to (1) violations of Florida nurse practitioner law; (2) violations of Medicare policy and procedures; and (3) Medicare billing fraud.

41. Relator trained many nurse practitioners, and Dr. Walker's company rapidly expanded to include Gainesville Spine & Injury, Lake City Spine & Injury and, eventually, Ethos Health Group.

42. As the company quickly grew, Relator observed more and more Medicare fraud occurring throughout the company. Relator continued to voice her concerns to her superiors. In February 2019, Relator was blindsided when she saw her job position listed on Indeed.com. Relator immediately contacted Jean Gonzalez to inquire as to what was happening with her employment. Relator laid out all of her concerns regarding Medicare fraud in an email to Jean Gonzalez on February 12, 2019. She was ultimately terminated by Jean Gonzalez on March 31, 2019. Relator's termination was a direct result of her attempts to stop the Medicare fraud Defendants were committing throughout the state of Florida.

## COUNT I

### Violations of the Federal False Claims Act, 31 U.S.C. § 3729, *et seq*

43. Relator incorporates paragraphs 1-42 of this Complaint, as though fully set forth herein. This count sets forth claims for treble damages and civil penalties under the FCA.

44. As described in greater detail above, Defendants engaged in behavior designed to defraud the Government. Defendants knowingly and purposefully submitted false claims for payment to the Medicare program for improperly prescribed and/or unnecessary DME, lab tests, injections, and physical therapy.

45. Under the FCA, Defendants have violated:

i. 31 U.S.C. § 3729(a)(1)(A) by knowingly presenting, or causing to be presented, a false or fraudulent claim for payment or approval; and

ii. 31 U.S.C. § 3729(a)(1)(B) by knowingly making, using, or causing to be made or used, a false record or statement material to a false or fraudulent claim.

46. Because of the false claims and/or certifications made by Defendants, the United States has suffered and continues to suffer damages, and is therefore entitled to a recovery as provided by the FCA of an amount to be determined at trial, plus a civil penalty for each violation.

## COUNT II

### Retaliation and Wrongful Discharge Under the Federal False Claims Act

47. Relator incorporates paragraphs 39-42 of this Complaint as though

fully set forth herein. This count sets forth claims for treble damages and civil penalties under the FCA.

48. Under the FCA, 31 U.S.C. § 3730(h), an employee who, because of her effort to stop one or more violations of the FCA, faces adverse employment action or discrimination, is entitled to relief.

49. As alleged above, Relator engaged in lawful acts in furtherance of efforts to stop violations of the FCA. Defendants were on notice of Relator's objections to Defendants' practices, which were in violation of material conditions of payments made by the Medicare program. As a direct result of her efforts, Relator was terminated. She is entitled to all relief necessary to make her whole.

## PRAYER

WHEREFORE, Relator, on behalf of the United States and the State of Florida, respectfully requests that:

a. This Court enter an order determining that Defendants violated the FCA by making false statements and records to cause false claims to be submitted to the United States;

b. This Court enter an order requiring Defendants to pay treble damages and the maximum civil penalties allowable to be imposed for each false or fraudulent claim presented to the United States;

c. This Court enter judgment against Defendants pursuant to 31 U.S.C. § 3730(h), including an award to Relator of two times the amount of her back pay, with interest, and compensation for special damages including litigation costs and reasonable attorney's fees;

d. This Court enter an order requiring Defendants to pay all expenses and attorney's fees and costs associated with this action;

e. This Court enter an order paying Relator the maximum statutory award for its contributions to the prosecution of this action; and

f. Any and all other relief as this Court determines to be reasonable and just.

## PLAINTIFF/RELATOR DEMANDS A TRIAL BY JURY ON ALL COUNTS.

Dated: February 25, 2022.

Respectfully submitted,

*/s/ Jesse Hoyer Estes*

Jesse Hoyer Estes
Florida Bar No.: 076934
jesse@hoyerlawgroup.com
Hoyer Law Group, PLLC
2801 W. Busch Blvd., Suite 200
Tampa, Florida 33618
Tel.: (813) 375-3700
Fax: (813) 375-3710

*Lead Counsel for Relator*